UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

STEVEN C. MILLER,                )
        Plaintiff,               )
                                 )
            v.                   )        C.A. No. 20-10660-MLW
                                 )
JEFFREY PUGLIESE, an             )
individual and a police          )
officer for the City of          )
Watertown,                       )
SEAN BOWLER, an individual       )
and a police officer for the     )
City of Watertown,               )
JOSEPH REYNOLDS, an              )
individual and a police          )
officer for the City of          )
Watertown,                       )
MICHAEL PELRINE, an              )
individual and a police          )
officer for the Town of          )
Belmont,                         )
ANTHONY DESTEFANO, an            )
individual and a police          )
officer for the Town of          )
Belmont,                         )
MARCO D'ANDREA, an individual    )
and a police officer for the     )
Town of Belmont,                 )
KEVIN SHEA, an individual and    )
a police officer for the Town    )
of Belmont, and                  )
THE TOWN OF BELMONT,             )
a Massachusetts Municipal        )
Corporation,                     )
        Defendants.              )

MEMORANDUM AND ORDER

WOLF, D.J.                                    September 22, 2023

I.   INTRODUCTION

    Plaintiff Steven Miller ("Miller") has brought this action

against Watertown Police Officers Jeffrey Pugliese, Sean Bowler,

and Joseph Reynolds in their individual capacities (collectively, the "Watertown Defendants"); Belmont Police Officers Michael Pelrine, Anthony DeStefano, Marco D'Andrea, and Kevin Shea in their individual capacities (collectively, the "Belmont Police Defendants"); and the Town of Belmont (collectively with the Belmont Police Defendants, the "Belmont Defendants").

Miller's claims arise out of an attempted traffic stop that led to police officers entering his home and arresting him. Miller now alleges: claims under 42 U.S.C. §1983 against all individual officers for (1) unlawful entry (Count One) and (2) unlawful seizure (Count Two); (3) a §1983 claim against the Town of Belmont for failure to train (Count Three); (4) a claim pursuant to the Massachusetts Civil Rights Act against all individual officers for unlawful entry and seizure (Count Four); (5) an abuse of process claim against the Belmont Police Defendants (Count Five); (6) a malicious prosecution claim against the Belmont Police Defendants (Count Six); (7) an excessive force claim against Pelrine (Count Seven); and (8) an intentional infliction of emotional distress claim against all individual officers (Count Eight).

The parties have filed cross-motions for summary judgment on all counts except Count Seven, the excessive force claim against Pelrine. A hearing on the motions was held on August 18, 2023. For the reasons described below, the court is denying Miller's motion

2

for summary judgment, allowing the Watertown Defendants' motion for summary judgment, allowing the Town of Belmont's motion for summary judgment, and allowing in part and denying in part the Belmont Police Defendants' motion for summary judgment.

More specifically, summary judgement is being granted for all of the individual defendants on Miller's claim of unlawful entry into his home (Count One), unlawful seizure (Count Two), and violation of the Massachusetts Civil Rights Act (Count Four) because the defendants have qualified immunity. Summary judgment is also being allowed for all of the individual defendants on Miller's intentional infliction of emotional distress claim (Count Eight). In addition, summary judgment is being granted for the Town of Belmont on Miller's failure to train claim. Miller's Motion for Summary Judgment is being denied. Defendants' Motion for Summary Judgment on Miller's abuse of process (Count Five) and malicious prosecution (Count Six) claims is being denied.

Accordingly, Miller is entitled to a trial on his claim of abuse of process against the Belmont Police Defendants (Count Five), his claim of malicious prosecution against the Belmont Police Defendants (Count Six), and his excessive force claim against Pelrine (Count Seven), which was not the subject of a motion for summary judgment.

3

II.  THE SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A factual dispute, therefore, precludes summary judgment if it is "material" and "genuine." See Anderson v. Liberty Lobby, 477 U.S. 242, 247-48 (1986).

A fact is "material" if, in light of the relevant substantive law, "it has the potential of determining the outcome of the litigation." Maymi v. P.R. Ports Auth., 515 F.3d 20, 25 (1st Cir. 2008); see also Martinez-Rodriguez v. Guevara, 597 F.3d 414, 419 (1st Cir. 2010). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248.

To determine if a factual dispute is "genuine," the court must assess whether "'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Chadwick v. WellPoint, Inc., 561 F.3d 38, 43 (1st Cir. 2009) (quoting Anderson, 477 U.S. at 248); Taylor v. Am. Chemistry Council, 576 F.3d 16, 24 (1st Cir. 2009). In making this determination, the court must "constru[e] the record in the light most favorable to the non-moving party." Douglas v. York Cnty., 433 F.3d 143, 149 (1st Cir. 2005). The record should not, however, be scrutinized piecemeal;

4

rather, it must be "taken as a whole." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Kelly v. Cort Furniture, 717 F. Supp. 2d 120, 122 (D. Mass. 2010). In addition, evidence submitted in an inadmissible form may be considered only if it could be presented in a form that would be admissible at trial. See Fed. R. Civ. P. 56(c)(2); Gorski v. N.H. Dep't of Corr., 290 F.3d 466, 475-76 (1st Cir. 2002); Vazquez v. Lopez-Rosario, 134 F.3d 28, 33 (1st Cir. 1998).

"Cross motions for summary judgment neither alter the basic Rule 56 standard, nor warrant the grant of summary judgment per se." Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996) (internal citations omitted). "Cross motions simply require [the court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." Id.

III. FACTS

Unless otherwise noted, the following facts are not disputed by the parties for the purpose of the cross-motions for summary judgment.

On March 4, 2017, at approximately 12:42 a.m., plaintiff Steven Miller took a left from Waverly Avenue onto Belmont Street in Belmont, Massachusetts. See DeStefano Aff. ¶¶8-9, Dkt. No. 60-1. In so doing, Miller ran a red light. Id. ¶9.

Defendant Anthony DeStefano, a Belmont police officer, observed Miller run the red light and activated the blue lights on his vehicle. See id. ¶11. Miller did not stop. Id. ¶13. Instead, he drove a short distance down the road into Watertown, Massachusetts, where he pulled into the driveway of his home at 870 Belmont St. Id.

Miller then exited his vehicle. Id. ¶14. He walked using crutches to the front door of his home and opened it. Miller Depo. at 112-13, Dkt. No. 55-4; DeStefano Aff. ¶16, Dkt. No. 60-1. DeStefano repeatedly ordered Miller to get back into his vehicle and Miller refused. See Miller Depo. at 187, Dkt. No. 55-4; DeStefano Police R., Dkt. No. 48-1 at 20. DeStefano called for backup. DeStefano Police R., Dkt. No. 48-1 at 20. Defendant Marco D'Andrea, a Belmont police officer, arrived. Id.

DeStefano and D'Andrea "several times" told Miller, who remained standing on the threshold of his home, that if he did not produce identification he would be arrested. DeStefano Aff. ¶21, Dkt. No. 60-1. Miller refused. Id. The officers claim that when asked for his name or where he was coming from, Miller responded "I don't know." D'Andrea Aff. ¶11, Dkt. No. 60-2. The officers also claim that Miller was incoherent and would not respond to simple questions. Id. ¶12. They further claim that Miller admitted he was on medication. DeStefano Aff. ¶25, Dkt. No. 60-1. Miller

disputes that he admitted this or that he was at all incoherent. See Miller Depo. at 139, Dkt. No. 55-4.

At some point, Miller retreated into his home and slammed the door shut on DeStefano and D'Andrea. See DeStefano Aff. ¶28, Dkt. No. 60-1. The parties dispute the sequence of events in which this happened. Miller testified that he was already inside the house when he was speaking with the officers and needed only to close the door. Miller Depo. at 134, 136, Dkt. No. 55-4. The officers state that Miller was outside of the house when he was speaking with them and then suddenly "backed into his house and slammed the door shut." DeStefano Aff. ¶28, Dkt. No. 60-1; see also D'Andrea Aff. ¶15, Dkt. No. 60-2.

Once the door was closed, Miller sat on the floor with his back to the door, barricading himself in the house. Miller Depo. at 168-69, Dkt. No. 55-4. DeStefano and D'Andrea attempted to force the front door open, but were unable to do so. DeStefano Police R., Dkt. No. 48-1 at 21.

Around this time, Belmont Police Sergeant David Sullivan, who is not a defendant, arrived at Miller's home. D'Andrea Police R., Dkt. No. 48-1 at 26. Sullivan recognized Miller's truck because he had been on a road detail for a project for which Miller was a contractor a few days earlier. Sullivan Police R., Dkt. No. 48-1 at 35. Soon after, Belmont police officer defendant Michael Pelrine

and another officer, who is not a defendant, arrived. Pelrine Police R., Dkt. No. 84-1 at 31. At this time, there were five Belmont police officers at Miller's home.

Defendant Jeffrey Pugliese, a Watertown Police Sergeant, subsequently arrived at Miller's home. DeStefano Aff. ¶32, Dkt. No. 60-1. Pugliese ordered Miller to open the door. Id. Miller refused. Id. Pugliese then told Miller that if he did not open the door, the officers would force entry. Id.; see also D'Andrea Aff. ¶19, Dkt. No. 60-2. Pugliese then called and asked the Watertown Fire Department to come to the scene to force entry. DeStefano Aff. ¶32, Dkt. No. 60-1; Watertown Police Dept. Log, Dkt. No. 55-3.

Prior to the Watertown Fire Department arriving, defendants Sean Bowler and Joseph Reynolds, both Watertown police officers, arrived. See DeStefano Aff. ¶33, Dkt. No. 60-1. There were then eight police officers at Miller's home - five Belmont officers and three Watertown officers.

At this time, Sullivan suggested that the officers issue a summons to Miller and returned to his cruiser. Sullivan Police R., Dkt. No. 48-1 at 35. Sullivan then spoke by telephone with Belmont Lieutenant Mark Hurley, who instructed Sullivan not to enter the house, but to issue a summons instead. Id.

8

Prior to the arrival of the Watertown Fire Department or the return of Sullivan from his police cruiser, Pugliese took a shovel from the porch and wedged the shaft into an opening at the top of the front door. Pelrine Police R., Dkt. No. 48-1 at 31; Miller Depo. at 144-45, Dkt. No. 55-4. DeStefano, D'Andrea, Pelrine, Bowler, Reynolds, and Pugliese then entered the home. See Miller Depo. at 158, Dkt. No. 55-4; D'Andrea Aff. ¶24, Dkt. No. 60-2.

The parties dispute what occurred next. The defendants claim that immediately upon police entering the house, Miller lunged, grabbed Pelrine's legs, and began striking him, which prompted Pelrine to hit Miller on his upper back and the back of his head while ordering him to let go. Pelrine Aff. ¶19, Dkt. No. 60-3. Miller claims that he was lying on the floor and protecting his face and head while at least two or three officers punched him in the back and head. See Miller Depo. at 172-181, Dkt. No. 55-4. Miller denies that he was the aggressor or attacked the officers in any way. Id. Miller was then placed on the floor in handcuffs by one of the officers. D'Andrea ¶28, Dkt. No. 60-2.

After Miller was in handcuffs, Sullivan returned from his police cruiser to Miller's home. Sullivan Police R., Dkt. No. 48-1 at 35-36. Miller was complaining of pain. Id. at 36. Sullivan asked if he wanted to go to the hospital. Id. Miller said he did. Id. Sullivan uncuffed Miller and told him that he would be issued

a summons. Id. Sullivan told the officers involved that, based on instructions from headquarters, Miller should not have been arrested. See DeStefano Aff. ¶47, Dkt. No. 60-1; D'Andrea Aff. ¶30, Dkt. No. 60-2; Pelrine Aff. ¶23, Dkt. No. 60-3; Sullivan Police R., Dkt. No. 48-1 at 35-36.

An ambulance was called, and Miller was transported by the Watertown Fire Department EMTs to Mt. Auburn Hospital. See Pelrine Aff. ¶¶24-25, Dkt. No. 60-3. Miller was examined but did not receive any medical treatment before he left because, he says, "there was nothing they could do for [him]." Miller Depo. at 210-11, Dkt. No. 55-4. No tests to measure the amount of alcohol in Miller's blood were done before he signed himself out of the hospital. Id. at 220, 223.

Later on March 4, 2017, DeStefano, D'Andrea, and Pelrine each filed a police report. See Police Rs., Dkt. No. 48-1 at 18-32. Each officer provided a version of events in which Miller attacked them. See id. The same day, Miller was issued a citation by the Belmont Police for violations of: Mass. Gen. L. ch. 89, §9 (failure to yield/stop); Mass. Gen. L. ch. 90, §25 (failure to stop for a police officer); and Mass. Gen. L. ch. 90, §25 (failure to provide identity). Belmont Police Citation, Dkt. No. 48-1 at 13. The citation made no reference to resisting arrest or assaulting a police officer. Id.

10

On the morning of March 6, 2017, the Monday after the early morning incident two days earlier, Belmont Captain J. Peter Hoerr sent an email to Hurley and Sullivan noting that the concern they expressed about whether to enter Miller's home without a warrant was proper. Hoerr Email, Dkt. No. 48-1 at 15. He told Hurley and Sullivan to "find a way to pass these concerns along [to the officers] as training if you have not done so already." Id.

The same morning, defendant Kevin Shea, a Belmont police sergeant who was not involved with the incident itself, reviewed the reports concerning the events on March 4, 2017. Shea Aff. ¶¶17-18, Dkt. No. 60-4. Shea was the Belmont Court Prosecutor. Id. ¶9. Part of his routine duty was to review police reports for accuracy to ensure that proper charges had been brought. Id. ¶13. Shea had the discretion to amend charges prepared by the arresting officers. Id. ¶14. Shea regularly amended charges brought prior to filing a criminal complaint. Id. ¶15. After reviewing the reports concerning Miller, Shea ordered further investigation for a potential Operating Under the Influence charge. Id. ¶¶20-21. The following day, March 7, 2017, Shea amended the charges against Miller in the citation to add Assault and Battery on a Police Officer and Resisting Arrest. Id. ¶26.

All criminal charges against Miller were dismissed by the state more than a year later. See id. ¶31.

11

Miller has not sought any psychological or emotional counseling since the March 4, 2017 incident. Miller Depo. at 234, Dkt. No. 55-4. He experiences nightmares "[p]robably once every couple months," after which he is not able to go to sleep "right away." Id. at 235. Miller also feels fear when he sees police cars, but he is able to go on with living and doing whatever it is that he is doing at the time. Id. at 236-37. Miller was afraid of police before the March 4, 2017 incident because of other incidents in the past. Id. at 237-38.

IV.  ANALYSIS

A.  Counts One and Two - Unreasonable Search and Seizure

The parties have filed cross-motions for summary judgment on Miller's claims of unreasonable search (Count One) and unreasonable seizure (Count Two) against the individual defendants, pursuant to 42 U.S.C. §1983. Miller's motion is being denied and the defendants' motions are being allowed because the officers are entitled to qualified immunity.

"Section 1983 'is not itself a source of substantive rights,'" but merely provides a cause of action for alleged violations of federal constitutional and statutory rights. Albright v. Oliver, 510 U.S. 266, 271 (1994) (quoting Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979)). Therefore, a plaintiff bringing a claim pursuant to §1983 must show: "(1) that the complained-of conduct was

committed under the color of state law, and (2) that such conduct violated his constitutional or federal statutory rights." Miller v. Town of Wenham, 833 F.3d 46, 51 (1st Cir. 2016).

However, as the Supreme Court has held:

An official sued under §1983 is entitled to qualified immunity unless it is shown that the official violated a statutory or constitutional right that was "'clearly established'" at the time of the challenged conduct. Ashcroft v. al-Kidd, 563 U.S. [731, 735] (2011). And a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it. Id., at [741]. In other words, "existing precedent must have placed the statutory or constitutional question" confronted by the official "beyond debate." Ibid. In addition, "[w]e have repeatedly told courts . . . not to define clearly established law at a high level of generality," id., at [742], since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.

Plumhoff v. Rickard, 572 U.S. 765, 778-79 (2014). In evaluating whether a right is "clearly established" for the purposes of a particular case, the court must look to whether there is "controlling authority" or "a robust 'consensus of cases of persuasive authority.'" al-Kidd, 563 U.S. at 742 (quoting Wilson v. Layne, 526 U.S. 603, 617 (1999)); see also Plumhoff, 572 U.S. at 779-80.

i) Entry into the House Violated the Fourth Amendment

"The Fourth Amendment ordinarily requires that police officers get a warrant before entering a home without permission."

13

Lange v. California, 141 S. Ct. 2011, 2016 (2021). However, an exception applies when "'the exigencies of the situation' make the needs of law enforcement so compelling" that warrantless entry by officers is justified. Mincey v. Arizona, 437 U.S. 385, 994 (1978) (quoting McDonald v. United States, 335 U.S. 451, 456 (1948)). To make a lawful warrantless entry, there must be both exigent circumstances and probable cause to arrest. See Kirk v. Louisiana, 536 U.S. 635, 638 (2002).

One such exigency is that in certain circumstances "officers may enter premises without a warrant when they are in hot pursuit of a fleeing suspect." Kentucky v. King, 563 U.S. 452, 460 (2011) (citing United States v. Santana, 427 U.S. 38, 42-43 (1976)). The pursuit need not be drawn out. Santana, 427 U.S. at 40, 43 (holding that a suspected felon "may not defeat an arrest which has been set in motion in a public place . . . by the expedient of escaping to a private place," id. at 43). The pursuit may begin with a suspect in the doorway of his home who immediately retreats into the home when police identify themselves. Id. However, when the underlying offense is a misdemeanor, flight alone is not an exigency that justifies a warrantless entry. More specifically:

> The flight of a suspected misdemeanant does not always justify a warrantless entry into a home. An officer must consider all the circumstances in a pursuit case to determine whether there is a law enforcement emergency. On many occasions, the officer will have good reason to enter — to prevent imminent harms of violence,

> destruction of evidence, or escape from the home. But when the officer has time to get a warrant, he must do so — even though the misdemeanant fled.

Lange, 141 S. Ct. at 2024.

In the instant case, officers had probable cause to believe that Miller had violated: Mass. Gen. L. ch. 89, §9 by running a red light; Mass. Gen. L. 90, §25 by failing to stop when signaled to stop by a police officer; and Mass. Gen. L. ch. 90, §25 by failing to provide identity to officer on request. None of these offenses can be punished with a period of incarceration.[1]

Therefore, the defendant officers must show circumstances beyond the flight itself, such as preventing "imminent harms of violence, destruction of evidence, or escape from the home," to justify the warrantless entry into Miller's home. Lange, 141 S. Ct. at 2024. In addition, the officers claim that they had reasonable suspicion to believe that Miller violated Mass. Gen. L. ch. 90 §24(1)(a)(1) by operating a motor vehicle under the influence of alcohol or narcotics, which is a jailable

---

[1] Violations of Mass. Gen. L. ch. 89, §9 are classified as civil infractions and are punishable by a fine of up to $150. See Mass. Gen. L. ch. 89, §9; Mass. Gen. L. ch. 90C, §1 (defining "[c]ivil motor vehicle infraction" as "an automobile law violation for which the maximum penalty does not provide for imprisonment"). Violations of Mass. Gen. L. ch. 90, §25 are criminal misdemeanors punishable by a fine of $100. See Mass. Gen. L. ch. 90, §25; Mass. Gen. L. ch. 90C, §1 (excluding violation of Mass. Gen. L. ch. 90, §25 from the definition of "civil motor vehicle infraction").

misdemeanor.[2] See DeStefano Aff. ¶36, Dkt. No. 60-1; D'Andrea Aff.
¶22, Dkt. No. 60-2. They contend that a separate exigency existed
because the officers suspected that the defendant had recently
operated a vehicle under the influence, a crime that created an
"imminent threat of harm to the public." Belmont Town MSJ Mem. at
11, Dkt. No. 59. Miller disputes the assertion that he was
operating under the influence. Miller Depo. ¶¶ 98-99, Dkt. No. 55-
4. In any event, the Watertown officers were told by the Belmont
officers that Miller had been driving while intoxicated. See
Pugliese Aff. ¶4, Dkt. No. 55-2. However, the Belmont officers
have only claimed that they had reasonable suspicion, not probable
cause, to believe that Miller was intoxicated. See DeStefano Aff.
¶36, Dkt. No. 60-1; D'Andrea Aff. ¶22, Dkt. No. 60-2; see also
Pelrine Aff. ¶10, Dkt. No. 60-3 (citing only knowledge of the
traffic violations and flight into the home).

Contrary to the Belmont Defendants' assertions, see Belmont
Town MSJ Mem. at 15-16, Dkt. No. 59, reasonable suspicion that a
crime has been committed is not sufficient to justify hot pursuit
onto private property. In Lange, the Court noted that probable
cause is necessary but not alone sufficient to justify a

---

[2] Under Mass. Gen. L. ch. 90 §24(1)(a)(1), individuals who are
convicted of operating a motor vehicle while under the influence
of alcohol or narcotics can be incarcerated for up to two and one-
half years.

warrantless entry in hot pursuit of a suspect. 141 S. Ct. at 2019;
Kirk, 536 U.S. at 638 ("[P]olice officers need either a warrant or
probable cause plus exigent circumstances in order to make a lawful
entry into a home."). Contrary to the Belmont Defendants'
contention, the cases that they cite do not hold that police need
only reasonable suspicion that a person committed a crime to enter
a home without a warrant; rather, the cases state that officers
only require reasonable suspicion as to the existence of the
exigent circumstances. See e.g., United States v. Beaudoin, 362
F.3d 60, 67 (1st Cir. 2004) ("[W]hether or not probable cause for
a crime exists, the inquiry determining the existence of an
exigency is essentially one of reasonable suspicion."); United
States v. Banks, 530 U.S. 31, 36 (2003) (holding that police may
disregard knock-and-announce when they have reasonable suspicion
that doing so will create a destruction-of-evidence exigency).
Probable cause to arrest and the existence of the exigency are
distinct, different requirements, and defendants' arguments
conflating the two are mistaken. See Kirk, 536 U.S. at 638.

Even assuming without finding that the officers had probable
cause to believe that Miller had operated his vehicle under the
influence, a reasonable fact finder would find that the officers
were not entitled to enter Miller's home without a warrant. As
explained earlier, the flight of a misdemeanant does not entitle

17

an officer in hot pursuit to enter a home without a warrant unless a separate exigency exists. See Lange, 141 S. Ct. at 2024; Kirk, 536 U.S. at 638. In this case, the possible crime of Driving Under the Influence was complete. Miller had barricaded himself inside of his home and no longer presented a threat to the public. Even if Miller had been driving while intoxicated, the fact that his blood alcohol level might have declined while police obtained a warrant is not an exigency permitting warrantless entry. See Welsh v. Wisconsin, 466 U.S. 740, 754 (1984)

In addition, Sullivan recognized the house and the truck as belonging to Miller when he arrived on scene. Sullivan Police R., Dkt. No. 48-1 at 35. Therefore, this matter is analogous to Mascorro v. Billings, 656 F.3d 1198 (10th Cir. 2011). In Mascorro, a police officer attempted to pull over a 17-year-old near midnight for driving without taillights. Id. at 1202. Instead of stopping, the young man drove two blocks to his parents' house, ran inside, and hid in the bathroom. Id. The court noted that where the arrest was for a traffic misdemeanor committed by a defendant "with whom the officer was well acquainted," and who had subsequently fled home, "[t]he risk of flight or escape was somewhere between low and nonexistent. Moreover, there was no evidence which could have potentially been destroyed and there were no officer or public safety concerns." Id. at 1207. The Supreme Court in Lange described

18

Mascorro as a clear example of a "non-emergency situation" where an exigency did not exist to allow for warrantless entry. Lange, 141 S. Ct. at 2021.

### ii) The Individual Defendants are Entitled to Qualified Immunity

In view of the foregoing facts, a reasonable factfinder would conclude that the warrantless entry into Miller's home was not justified by the hot pursuit doctrine, or any other exigency, and the officers' entry and seizure of Miller violated his Fourth Amendment rights. Therefore, the remaining question is whether the Fourth Amendment rights that were violated in this case were clearly established at the time and only a malicious or plainly incompetent officer would have violated them. See Morales v. Chadbourne, 793 F.3d 208, 214 (1st Cir. 2015).

As explained earlier, it is not sufficient that a right be established at a high level of generality. See Plumhoff, 572 U.S. at 779; al-Kidd, 563 U.S. at 742. Rather, it is necessary to analyze whether the law is clearly established "in light of the specific context of the case." Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)); see also Hunt v. Massi, 773 F.3d 361, 368 (1st Cir. 2014) (holding in a Fourth Amendment excessive force case that the relevant inquiry was whether plaintiff "had a clearly established right to be handcuffed with his hands in front of him when it would not be

19

obvious to a reasonable officer that Hunt's abdominal scar would prevent him from putting his hands behind his back").

In this case, the relevant question is whether Miller had a clearly established right to have hot pursuit end when he entered his home when the pursuing officers had probable cause to arrest him for a misdemeanor, but no exigency in addition to the flight itself existed. In 2017, the existing precedent did not place this "constitutional question beyond debate." al-Kidd, 563 U.S. at 741. Therefore, the individual defendants are entitled to qualified immunity.

That the rights concerning a hotly pursued fleeing misdemeanant were not clearly established at the time of the March 4, 2017 incident has been repeatedly and explicitly recognized by the Supreme Court. In 2013, in Stanton v. Sims, 134 S. Ct. 3 (2013), a police officer entered private property without a warrant in hot pursuit of a fleeing suspect whom the officer had probable cause to arrest for a misdemeanor. Id. at 4. There was no immediate danger or other exigency. Id. Reversing the Ninth Circuit, the Court held that the officer was entitled to qualified immunity. Id. at 7. The Court noted that "federal and state courts nationwide [were] sharply divided on the question." Id. at 5. Therefore, it held that "whether or not the constitutional rule applied by the court below was correct, it was not 'beyond debate,'" whether a

suspected misdemeanant's flight alone permitted warrantless entry to arrest during hot pursuit. Id. at 7.

The Court later recognized that the question was unsettled as of 2021. In Lange, the Court wrote:

> Courts are divided over whether the Fourth Amendment always permits an officer to enter a home without a warrant in pursuit of a fleeing misdemeanor suspect. Some courts have adopted such a categorical rule, while others have required a case-specific showing of exigency. We granted certiorari to resolve the conflict.

Lange, 141 S. Ct. at 2017 (internal citation removed). In Lange, the Court for the first time settled that question which had divided lower courts. It held that:

> The flight of a suspected misdemeanant does not always justify a warrantless entry into a home. An officer must consider all the circumstances in a pursuit case to determine whether there is a law enforcement emergency. On many occasions, the officer will have good reason to enter—to prevent imminent harms of violence, destruction of evidence, or escape from the home. But when the officer has time to get a warrant, he must do so—even though the misdemeanant fled.

Id. at 2024. As the relevant law was not clearly established before Lange was decided in 2021, the individual defendants are protected by qualified immunity for their conduct in 2017.

This conclusion is not, as Miller contends, qualified by the Supreme Court's 1984 decision in Welsh v. Wisconsin, 466 U.S. 740 (1984). Welsh was a case in which a suspected drunk driver abandoned his vehicle, walked home, and went to sleep in his bedroom. Id. at 742-43. The police tracked him to his home, entered

without a warrant, and arrested him. Id. The Court noted that the case did not involve hot pursuit because there was not an immediate and continuous pursuit of the driver from the scene of the crime. Id. at 753. The Court held that, at least in the absence of hot pursuit, "an important factor to be considered when determining whether any exigency exists is the gravity of the underlying offense," and that the exigent circumstances exception to the warrant requirement should "rarely be sanctioned" where the crime is minor. Id. Therefore, as Driving Under the Influence was only a civil forfeiture offense in Wisconsin in 1984, the Court held that Welch's Fourth Amendment rights had been violated by the warrantless entry into his home. Id. At 754.

If Welsh had clearly established the law relating to the conduct at issue in this case, the Supreme Court would not in 2013, in Stanton, have found that the defendants had qualified immunity because "the law regarding warrantless entry in hot pursuit of a fleeing misdemeanant [was] not clearly established." Stanton, 571 U.S. at 10 (emphasis added). In reaching this conclusion, the Court emphasized that "Stanton was in hot pursuit of [the defendant]" and "nothing in [Welsh] establishes that the seriousness of the crime is equally important in cases of hot pursuit." Id. at 9-10 (emphasis in original).

22

Similarly, if the law relevant to this case was clearly established by Welsh, the Court in 2021, in Lange, would not have stated that "Courts are divided over whether the Fourth Amendment always permits an officer to enter a home without a warrant in pursuit of a fleeing misdemeanor suspect," and cited many examples of the divide. Lange, 141 S. Ct. at 2017 & n.1. In Lange, the Supreme Court again noted that in Welsh, "no police pursuit was necessary, hot or otherwise." Id. at 2020.[3]

Therefore, the plaintiff's motion for summary judgment is being denied and the defendants' motions for summary judgment are being allowed as to Counts One and Two.

B.   Count Three – Failure to Train

Under Monell v. Department of Social Services, 436 U.S. 658 (1978), municipal entities can be held liable on a §1983 claim only when the violation of the plaintiff's rights can be attributed

---

[3]    In Lange, 141 S. Ct. at 2017 n.1, the Supreme Court cited the Massachusetts Supreme Judicial Court decision in Commonwealth V. Jewett, 31 N.E.3d 1079 (Mass. 2015) as a case exemplifying the fact that courts were divided on whether the Fourth Amendment never permits police officers to pursue a person for a non-jailable misdemeanor into his home without a warrant. Lange rejected this categorical approach, Lange, 141 S. Ct. at 2021-22, and thus abrogated Jewett. Therefore, like Welsh, contrary to Miller's contention, Jewett does not alter Lange's statement that courts were in 2021 divided on whether the conduct in 2017 at issue in this case violated the Fourth Amendment. Id. at 2017. Accordingly, Jewett does not alter the conclusion that the individual defendants in this case are entitled to qualified immunity.

to the official policy, edicts, or acts of that entity itself. See id. at 694-95.

In Count Three, Miller alleges Monell liability against the Town of Belmont on a theory that the Town failed to adequately train its officers. "[T]here are limited circumstances in which an allegation of a 'failure to train' can be the basis for liability under §1983." City of Canton v. Harris, 489 U.S. 378, 387 (1989). In such circumstances, "the failure to provide proper training may fairly be said to represent a policy for which the city is responsible." Id. at 390. However, such a theory "can only yield liability against a municipality where that city's failure to train reflects deliberate indifference to the constitutional rights of its inhabitants." Id. at 392.

This standard is met where the plaintiff shows specific training deficiencies, and "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights," that the policymakers must have been deliberately indifferent. Id. at 390. A "'single incident' of misconduct, without other evidence, cannot provide the basis for municipal liability under § 1983." Bordanaro v. McLeod, 871 F.2d 1151, 1161 n.8 (1st Cir. 1989) (citing Oklahoma City v. Tuttle, 471 U.S. 808, 823-24 (1985)); see also Hill v. Walsh, 884 F.3d 16, 24 (1st Cir. 2018); Santiago v. Fenton, 891

24

F.2d 373, 382 (1st Cir. 1989). "The Supreme Court has held that a 'pattern of similar constitutional violations' is 'ordinarily necessary' to establish municipal liability," Hill, 884 F.3d at 24 (quoting Connick v. Thompson, 563 U.S. 51, 62 (2011)), "unless 'the need for more or different training is so obvious and the inadequacy [is] so likely to result in the violation of constitutional rights,'" id. at 24 (quoting City of Canton v. Harris, 489 U.S. 378, 390 (1989)).

General showings of insufficient training are inadequate to prove liability under a failure to train theory. Instead, the plaintiff must show that the training program for the officers is specifically and consistently flawed:

> In resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform. That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program. It may be, for example, that an otherwise sound program has occasionally been negligently administered. Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct.

City of Canton, 489 U.S. at 390-91 (internal citations omitted). "[A] training program must be quite deficient in order for the deliberate indifference standard to be met: the fact that training is imperfect or not in the precise form a plaintiff would prefer

is insufficient to make such a showing." Young v. City of Providence, 404 F.3d 4, 27 (1st Cir. 2005).

In addition, the failure to train alone does not give rise to a municipal liability claim. The plaintiff must also demonstrate that the deliberately indifferent training "actually caused" the deprivation of the plaintiff's federally protected right. City of Canton, 489 U.S. at 391.

As explained earlier, viewing the evidence in the light most favorable to Miller, he has shown that his constitutional rights were violated by the Belmont police officers who were involved in the unconstitutional entry and seizure. Miller provides no evidence of a pattern of similar incidents. Rather, he cites only to a single suit involving another Belmont police officer who was accused of punching a handcuffed suspect in the stomach. See Pl.'s Opp'n to MSJ at 11, Dkt. No. 63 (citing Masciari v. Town of Belmont, No. 19-cv-10066, 2020 WL 6586370 (D. Mass. Nov. 10 2020)). That case eventually settled.

Miller has also provided no evidence regarding specific aspects of the Town of Belmont's training programs. In contrast, the Town has produced affidavits regarding the training and experience of the officers involved. See DeStefano Aff. ¶4-7, Dkt. No. 60-1; D'Andrea Aff. ¶4-7, Dkt. No. 60-2; Pelrine Aff. ¶4-7, Dkt. No. 60-3. Miller's only evidence regarding training is the

email Capt. Hoerr sent to Hurley and Sullivan dated February 21, 2019. See Dkt. No. 64-3. This email in essence states that the concern that Sullivan and Hurley had about entering Miller's home without a warrant was proper. Id. The email then discusses alternative tactics to arrest Miller before he entered the house, before concluding: "While these may now already be lessons learned by the officers, find a way to pass these concerns along as training if you have not done so already. Let me know when this has been done." Id.

Therefore, Miller has not identified any specific deficiency in training. He has also failed to provide any evidence of a pattern of constitutional violations. Such evidence is insufficient to meet the high threshold for showing either inadequate training or deliberate indifference. Accordingly, Defendant Town of Belmont's Motion for Summary Judgment on Count Three is being allowed.

C.   Count Four - Massachusetts Civil Rights Act

The individual defendants have moved for summary judgment on Count Four, which alleges violations of the Massachusetts Civil Rights Act, Mass. Gen. L. Ch. 12, §11I ("MCRA").

The MCRA provides a right of action to any person whose exercise of state or federal constitutional rights has been interfered with, or attempted to be interfered with, by any person

27

or persons, whether or not acting under color of law, "by threats, intimidation, or coercion." Id. §11H. "On its face, the MCRA contemplates a two-part sequence: (1) the defendant threatens, intimidates, or coerces the plaintiff, in order to (2) cause the plaintiff to give up something that the plaintiff has the constitutional right to do." Goddard v. Kelley, 629 F. Supp. 2d 115, 128 (D. Mass. 2009). "A direct violation of a person's rights does not by itself involve threats, intimidation, or coercion and thus does not implicate the Act." Longval v. Comm'r of Corr., 535 N.E.2d 588, 593 (Mass. 1989). "Rather, to be actionable, a defendant's actions must amount to 'an attempt to force someone to do something the person is not lawfully required to do.'" Farrah v. Gondella, 725 F. Supp. 2d 238, 248 (D. Mass. 2010) (quoting Freeman v. Planning Bd. of W. Boylston, 646 N.E.2d 139, 149 (Mass. 1995)). "Thus, for example, the statute would apply where a defendant (1) threatened to beat up the plaintiff if (2) the plaintiff exercised his right to vote." Goddard, 629 F. Supp. 2d at 128.

To the extent that Miller brings an MCRA claim "because it is clear that the unlawful entry and seizure of the Plaintiff was by way of 'threat, intimidation or coercion,'" Pl. Opp'n to MSJ at 8, Dkt. No. 63, his claims fail as a matter of law. "[E]ven accepting that any arrest attended by force is intrinsically coercive, 'there

still must be under [the] MCRA some allegation that the defendant's
conduct was intended to coerce [the plaintiff] into refraining
from the exercise of a right or privilege secured by law.'"
Mercurio v. Town of Sherborn, 287 F. Supp. 3d 109, 123 (D. Mass.
2017) (quoting Barbosa v. Conlon, 962 F. Supp. 2d 31, 332 (D. Mass.
2013)). The direct violation of a right cannot itself be the
coercion. Longval, 535 N.E.2d at 593 (Mass. 1989). Therefore, if
Miller's claim relied on the unlawful entry and seizure alone,
such facts would be insufficient to succeed on a claim under the
MCRA.

However, Miller also provides evidence that at least one
defendant threatened to break down his door unless he opened it.
Miller argues that this threat to break down his door or to call
the fire department to force their way into his home were intended
to coerce him into giving up his right to be secure in his home by
opening the door and surrendering. At least one other court has
found that similar evidence is sufficient to survive summary
judgment. See Morse v. Commonwealth of Mass. Exec. Off. of Pub.
Safety Dep't of State Police, 123 F. Supp. 3d 179, 195 (D. Mass.
2015), aff'd in part, appeal dismissed in part, Morse v. Cloutier,
869 F.3d 16 (1st Cir. 2017). In Morse, which was not a hot pursuit
case, officers gathered outside the plaintiffs' home and demanded
that he exit and submit to arrest. Morse, 123 F. Supp. 3d at 195.

29

Morse refused and told the officers to get a warrant. Id. The officers responded that if Morse did not comply, they would enter by force. Id. The court wrote that, "[v]iewed in the light most favorable to Plaintiffs, this conduct plainly amounts to the use of threats, intimidation, or coercion to convince Morse to give up his constitutional right to be free from unreasonable seizures inside the home." Id. This court agrees.

The defendants are nevertheless entitled to summary judgment based on qualified immunity. The Massachusetts Supreme Judicial Court has held that "the Legislature intended to provide a remedy under [the MCRA] coextensive with 42 U.S.C. §1983 . . . except that the Federal statute requires State action whereas its State counterpart does not." Duarte v. Healy, 537 N.E.2d 1230, 1232 (Mass. 1989) (quoting Batchelder v. Allied Stores Corp., 473 N.E.2d 1128, 1131 (Mass. 1985)). Consequently, the Court found qualified immunity for the MCRA coextensive with that in §1983 cases. Id.; see also Ortiz v. Morris, 97 N.E.3d 1152, 1156 (Mass. App. Ct. 2020). As previously discussed, at the time of the March 4, 2017 incident, a reasonable officer could have believed that he had the right to pursue Miller into his home without a warrant. Consequently, the officers are entitled to qualified immunity.[4]

---

[4] This case is, therefore, distinguishable from Morse. In Morse, no exigencies or hot pursuit of any kind were involved. Morse, 123 F. Supp. 3d at 191 & n.7, 192. The court concluded that

Therefore, as to Count Four, Miller's Motion for Summary Judgment is being denied and the defendants' motions for summary judgment are being allowed.

D.   Count Five - Abuse of Process

The Belmont Police Defendants' motion for summary judgment on Miller's abuse of process claim is being denied because there are material facts in dispute.

"The elements of an abuse of process claim are that: '(1) process was used; (2) for an ulterior or illegitimate purpose; (3) resulting in damage.'" Gutierrez v. Mass. Bay Transp. Auth., 772 N.E.2d 552, 563 (Mass. 2002) (quoting Datacomm Interface, Inc. v. Computerworld, Inc., 489 N.E.2d 185, 195 (1986)). "Process," in this context, means the use of legal action or causing papers to issue by a court to bring a party within its jurisdiction. Silvia v. Bldg. Inspector of W. Bridgewater, 621 N.E.2d 686, 687 & n.4 (Mass. App. Ct. 1993). In the context of an abuse of process claim,

---

the evidence, viewed in the light most favorable to the plaintiff, could show that no reasonable officer would have understood the warrantless entry and arrest to comport with the Fourth Amendment. Id. at 192. The court made clear that MCRA claim based on the unlawful entry and seizure survived only because the officers were not entitled to qualified immunity on the warrantless entry and arrest itself. Id. at 195 n.10; see also id. (granting officers qualified immunity as to the MCRA claim relating to excessive force because the officers had qualified immunity with regard to the §1983 excessive force claim).

the "ulterior or illegitimate purpose" must be "to gain some collateral advantage." Psy-Ed Corp. v. Klein, 947 N.E.2d 520, 534-35 (Mass. 2011).

The Belmont Police Defendants, who are the sole defendants for Count Five, have moved for summary judgment. See Dkt. No. 57. Defendants argue that there is no evidence of any ulterior motive. Id. at 16.

Viewing the evidence in the light most favorable to Miller, a reasonable factfinder could conclude that his Fourth Amendment rights were violated by use of excessive force by Pelrine. See Miller Depo. at 172, Dkt. No. 55-4. Indeed, Pelrine has not moved for summary judgment on the excessive force claim against him in Count Seven.

Miller asserts that he did not attack the officers. Id. at 172-181. Defendants claim that Pelrine was attacked first by Miller. See, e.g., Pelrine Aff. ¶19, Dkt. No. 60-3. Shortly after the incident, the ranking Belmont officer on the scene, Sullivan, told the officers involved that, based on instructions from headquarters, they should not have arrested Miller. See DeStefano Aff. ¶47, Dkt. No. 60-1; D'Andrea Aff. ¶30, Dkt. No. 60-2; Pelrine Aff. ¶23, Dkt. No. 60-3; Sullivan Police R., Dkt. No. 48-1 at 35-36. Later that day, DeStefano, D'Andrea, and Pelrine filed police reports consistent with their version of events. See Police Rs.,

Dkt. No. 48-1 at 18-32. However, the officers did not include charges for Assault and Battery on a Police Officer or Resisting Arrest in the initial citation. See Belmont Police Citation, Dkt. No. 48-1 at 13. Two days later, Capt. Hoerr sent an email to the defendants' supervisors, essentially confirming that the officers had been wrong to enter Miller's house and seize him. Hoerr Email, Dkt. No. 48-1 at 15. In these circumstances, a reasonable factfinder could conclude that the officers had reason to fear that they would be sued for violating Miller's constitutional rights.

The following day, Shea decided to charge Miller in court with Assault and Battery on a Police Officer and Resisting Arrest, as well as the three misdemeanors for which he had previously been cited. See Shea Aff. ¶26, Dkt. No. 60-4. Each Belmont defendant states that he did not communicate with Shea about the incident or the charges against Miller. See DeStefano Aff. ¶55, Dkt. No. 60-1; D'Andrea Aff. ¶38, Dkt. No. 60-2; Pelrine Aff. ¶30, Dkt. No. 60-3; Shea Aff. ¶28, Dkt. No. 60-4.

Nevertheless, this evidence does not foreclose the possibility that a jury could reasonably believe Miller's version of events, and conclude that the officers had fabricated the claim that Miller assaulted them in their reports and - after being reprimanded by their captain - caused additional charges to be

33

brought against Miller to discourage him from suing them or as a bargaining chip if he did.

In Gutierrez v. Massachusetts Bay Transportation Authority, the Massachusetts Supreme Judicial Court held that a jury could find for the plaintiff on an abuse of process claim on facts very similar to Miller's version of events in this case. In Gutierrez the Court wrote:

> The plaintiffs allege that the defendants included false facts in their arrest reports, and that the inclusion of these facts encouraged the prosecution to bring process against the defendants. The jury could infer that the officers' reports intentionally exaggerated the gravity of the situation so that the prosecutor would be more likely to press charges. Probable cause at the time of the arrest does not equate necessarily with subjective good faith in filling out an arrest report at a later time. By the time the arrest reports were being prepared, the officers were aware of the extent of [one of the plaintiff's] injuries, and the desire to see the plaintiffs prosecuted could be interpreted as a preemptive maneuver in anticipation of tort and civil rights claims.

Gutierrez, 772 N.E.2d at 563.

"It is impossible at this stage to know which of these dramatically different descriptions of the arrest scene will be found by the jury to be credible." Hutchins v. McKay, 285 F. Supp. 3d 420, 430 (D. Mass. 2018). "Because a reasonable jury could find that [the defendants] 'exaggerated the gravity of the situation so that the prosecutor would be more likely to press charges,'"

34

summary judgment for defendants on Count Five is not justified. Id.

Therefore, the defendants' Motion for Summary Judgment (Dkt. No. 56) is being denied as to Count Five.

### E.   Count Six - Malicious Prosecution

The Belmont Police Defendants, who are the only defendants on Count Six, which alleges malicious prosecution, have moved for summary judgment. That request too is unmeritorious.

"To make out a claim for malicious prosecution, a plaintiff must prove: (1) the institution of criminal process against the plaintiff with malice; and (2) without probable cause; and (3) the termination of the criminal proceeding in favor of the plaintiff." Gutierrez, 772 N.E.2d at 561 (internal quotation omitted).

Miller claims there was not probable cause to arrest him for assault and battery on a police officer or for resisting arrest. Compl. ¶¶114-15, Dkt. No. 1-1. As indicated earlier, these charges were dismissed by the state. Shea Aff. ¶31, Dkt. No. 60-4.

Malice is defined as "any wrong or unjustifiable motive," and may be inferred from a lack of probable cause. Campbell v. Casey, 166 F. Supp. 3d 144, 153 (D. Mass. 2016) (quoting Wilder v. Holden, 41 Mass. 8, 24 (Mass. 1833)); see also Alvarez v. City of Worcester, 605 F. Supp. 3d 304, 314 (D. Mass. 2022). In a malicious prosecution claim, whether probable cause to arrest existed is a

question for the jury. See Gutierrez, 772 N.E.2d at 563. Moreover, as discussed previously, a jury could reasonably find that the prosecution of Miller was "preemptive maneuver in anticipation of tort and civil rights claims," which have indeed been brought in this case. Id.

As discussed earlier, there is a genuine factual dispute concerning whether Miller attacked Pelrine. The defendant's motion for summary judgment on Count Six, therefore, is subject to essentially the same analysis as the Abuse of Process claim. See Hutchins, 285 F. Supp. 3d at 430 (noting that the analysis of malicious prosecution and abuse of process claims are "substantially similar"). Where the jury must decide whether it finds credible the disputed facts that would have given the officers probable cause for the charges, summary judgment is not justified. Id.

Therefore, defendants' Motion for Summary Judgment on Count Six is being denied.

F.   Count Eight - Intentional Infliction of Emotional Distress

All of the individual defendants have moved for summary judgment on Count Eight, which alleges intentional infliction of emotional distress ("IIED"). That request is meritorious.

To prevail on an IIED claim, a plaintiff must prove:

> (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct ...; (2) that the conduct was "extreme and outrageous," was "beyond all possible bounds of decency" and was "utterly intolerable in a civilized community" ...; (3) that the actions of the defendant were the cause of the plaintiff's distress ...; and (4) that the emotional distress sustained by the plaintiff was "severe."

Howell v. Enter. Publ'g Co., LLC, 920 N.E.2d 1, 28 (Mass. 2010) (quoting Agis v. Howard Johnson Co., 355 N.E.2d 315, 319 (Mass. 1976)). In Massachusetts, recovery is possible for emotional distress even without a showing of any bodily harm. Agis, 355 N.E.2d at 318.

Miller claims that both the alleged excessive force and the unlawful entry into his home were sufficiently extreme and outrageous to prove IIED.

As a threshold matter, Miller's IIED claim is not, as defendant contends, barred by the Massachusetts Torts Claims Act (MTCA). The MTCA bars "any claim based upon the exercise or performance . . . [of] a discretionary function or duty on the part of a . . . public employee, acting within the scope of his office or employment, whether or not the discretion involved is abused." Mass. Gen. L. ch. 258 §10(b). "Generally, 'conduct of [a] law enforcement official[ ] in investigating potentially criminal conduct' would require discretion on the part of the official and 'fall within the exception in § 10(b).'" Ryan v. City of Malden,

87 N.E.3d 114, 2017 WL 3044691, at *3 (Mass. App. Ct. Jul. 19, 2017) (table case) (quoting Sena v. Comm'r, 629 N.E.2d 986, 990 (Mass. 1994)). However, where the officer's conduct "exceeds the bounds of the law," such conduct is not protected. Id. (holding that where officers performed an unlawful warrantless search and seizure, trial court judge was correct to deny a motion to dismiss based on MTCA immunity). Because the officers were not within the bounds of the law, but violated the Fourth Amendment when they entered Miller's home and seized him, Miller's IIED claim is not barred by the MTCA.

However, Miller's claim fails on the merits as a matter of law. "Under Massachusetts law, a plaintiff must show he suffered 'severe' emotional distress as one of the four elements of an IIED claim." Kennedy v. Town of Billerica, 617 F.3d 520, 530 (1st Cir. 2010). Even assuming without finding that the defendants' behavior was extreme and outrageous,[5] Miller has failed to provide evidence

---

[5] Although the court does not reach this issue in the instant matter, "[i]t is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so." Caputo v. Bos. Edison Co., 924 F.2d 11, 14 (1st Cir. 1991) (quoting Restatement (Second) of Torts §46 cmt. h (Am. L. Inst. 1965)). Liability can be found only "where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Foley v. Polaroid Corp., 508 N.E.2d 72, 82 (Mass. 1986) (quoting Restatement (Second) of Torts §46, cmt. d (1965)). Even taking as true Miller's evidence that the defendants unlawfully forced their

38

sufficient to prove that the emotional distress he suffered was "severe." To show such severity, the plaintiff must show that he suffered the "kind of distress 'that no reasonable man could be expected to endure.'" Id. (quoting Agis, 355 N.E.2d at 319). A plaintiff cannot prevail with mere "emotional responses including anger, sadness, anxiety, and distress." Quinn v. Walsh, 732 N.E.2d 330, 338 (Mass. App. Ct. 2000) (abrogated on other grounds).

Kennedy involved an IIED claim following the wrongful arrest of a fourteen-year-old. Kennedy, 617 F.3d at 530. In his testimony, the boy alleged that he feared going to court, and that "this arrest, as well as other incidents, had made him generally 'nervous,' afraid of police sirens, and had sometimes given him

---

way into his home, and Pelrine, unprovoked, punched Miller in his head and back, such behavior is not necessarily extreme and outrageous. See Lund v. Henderson, 22 F. Supp. 3d 94, 106 (D. Mass. 2014) (granting summary judgment to defendants on an IIED claim where police allegedly unlawfully arrested the plaintiff, pulled his hands and twisted his arms behind his back, dragged him to a police cruiser, and pushed his head down); see also Burgos Martinez v. City or Worcester, 502 F. Supp. 3d 606, 621-22 (D. Mass. 2020) (granting summary judgment to defendants on an IIED claim where, following lawful arrest, officer threatened to urinate in plaintiff's fish tank and make him drink it, and beat handcuffed plaintiff to the extent that he had visible markings and a chest contusion). Rather, in cases where excessive force has led to a successful IIED claim, the excessive force used was significantly more extreme than the evidence supports in this case, and left serious physical injury. See, e.g., Poy v. Boutselis, 352 F.3d 479, 485-86 (1st Cir. 2003); Barbosa v. Conlon, 962 F. Supp. 2d 316, 324, 334 (D. Mass. 2013); Turkowitz v. Town of Provincetown, 914 F. Supp. 2d 62, 67-68, 75 (D. Mass. 2012).

'nightmares' that produced sweating and a racing pulse." Id. at 531. The First Circuit held that, as a matter of law, defendants were entitled to judgment because such showings did not satisfy the requirement of "severe" emotional distress. Id.

In this case, Miller has provided evidence of symptoms almost identical to those that were found to be insufficient in Kennedy. Miller has not sought any psychological or emotional counseling since the March 4, 2017 incident. Miller Depo. at 234, Dkt. No. 55-4. Miller states that he experiences nightmares "[p]robably once every couple months," after which he is not able to go to sleep "right away." Id. at 235. Miller also testified that he feels fear when he sees police cars, but that he is able to go on with living and doing whatever it is that he is doing at the time. Id. at 236-37. In addition, he testified that he was afraid of police before the March 4, 2017 incident because of other incidents in the past. Id. at 237-38. As in Kennedy, this evidence, without more, is insufficient for a jury to find the severe emotional distress required to prove an IIED claim. See Kennedy, 617 F.3d at 530.

Therefore, defendants' Motions for Summary Judgment are being allowed as to Count Eight.

V.    CONCLUSION

In view of the foregoing, summary judgment is being granted for all of the individual defendants on Miller's claims of unlawful entry into his home (Count One), unlawful seizure (Count Two), and violation of the Massachusetts Civil Rights Act (Count Three), because the defendants are protected by qualified immunity. Summary judgment is also being allowed for all of the individual defendants on Miller's intentional infliction of emotional distress claim (Count Eight). In addition, summary judgment is being granted for the Town of Belmont on Miller's failure to train claim. Miller's motion for summary judgment is being denied.

Accordingly, the claims remaining to be tried are Miller's claims of: abuse of process (Count Five); malicious prosecution (Count Six); and use of excessive force claim against Pelrine (Count Seven), which was not subject to a motion for summary judgment.

41

VI.   ORDER

In view of the foregoing, it is hereby ORDERED that:

1.   Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 47) is DENIED;

2.   The Watertown Defendants' Motion for Summary Judgment (Dkt. No. 52) is ALLOWED;

3.   The Belmont Police Defendants' Motion for Summary Judgment (Dkt. No. 56) in ALLOWED as to Counts One, Two, and Eight, and DENIED as to Counts Five and Six; and

4.   The Town of Belmont's Motion for Summary Judgment (Dkt. No. 58) is ALLOWED.

5.   The parties shall, by October 20, 2023, confer and report concerning whether they have reached an agreement to resolve the remaining claims or want to go to mediation before a magistrate judge concerning them.

6.   If no settlement is reached, the parties shall, by November 17, 2023, respond to the pretrial order attached hereto as Exhibit 1.

7.   A pretrial conference shall be held on December 7, 2023, at 2:00 p.m. It shall be attended by the parties and a representative with full settlement authority of each insurer involved in this case.

UNITED STATES DISTRICT JUDGE

42